# UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

---

United States of America,                           Crim. No. 10-335 (JRT/JJK)

                Plaintiff,

v.

David Jones, Jr.,                                   **REPORT AND RECOMMENDATION**

                Defendant.

---

Thomas M. Hollenhorst, Assistant United States Attorney, counsel for Plaintiff.

Kassius O. Benson, counsel for Defendant Jones.

---

JEFFREY J. KEYES, United States Magistrate Judge

This matter is before the Court on Defendant David Jones' Motions to Suppress Evidence and Statements (Doc. No. 12, 13, 18). This Court held a hearing on the motions on January 7, 2011, and received testimony from Detective Officer Russell Clark from the Blaine Police Department. This Court also received one exhibit from the Government: an application for a search warrant, the warrant, and the return. The matter was referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and D. Minn. Loc. R. 72.1. For the reasons stated below, this Court recommends that Defendant Jones' motions be denied.

## BACKGROUND

On December 14, 2010, Defendant was indicted for possession with intent to distribute heroin in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). (Doc. No. 1.) The facts giving rise to Defendant's Indictment are as follows.   On December 5, 2010, Detective ("Det.") Officer Russell Clark spoke with a concerned citizen informant about Defendant. (Tr. 6.) The informant told Det. Clark that Defendant had arrived from Chicago, Illinois with more than 100 grams of heroin and was staying in Room 255 at the LivInn Suites in Fridley, Minnesota. (Tr. 6, 8.)[1] The informant said that he had learned this information from Defendant's girlfriend, Convona Sims. (Tr. 8.)  According to the informant, Defendant used rental cars on multiple occasions to bring quantities of heroin from Chicago to distribute it in the Minneapolis area. (Tr. 6–7, 36–37.)  The informant told Det. Clark that Defendant was trying to sell heroin from his room at the LivInn Suites (Tr. 6, 8), and that Defendant was using a gray or silver Dodge Avenger rental car. (Tr. 9.) The informant also identified Defendant in a photograph. (Tr. 7.) After speaking with the informant, another officer, Det. Irish, confirmed David Jones and Convona Sims' registration at LivInn Suites by reference to the hotel's guest registry.  (Tr. 9.)

On December 8, 2010, police officers began watching the hotel for suspicious vehicle traffic "that would be indicative of narcotic-related activity."

---

[1]    The LivInn Suites in Fridley has been the site of numerous controlled substances-related arrests and apprehensions in the past.  (Gov.'t Ex. 1 at 2.)

(Tr. 10.) Based on the informant's description of Defendant's vehicle, the officers noted a gray or silver Dodge Avenger parked in the LivInn Suites' parking lot. (Tr. 10.) After dark and sometime between 7:00 and 7:45 p.m. (Tr. 11; Gov.'t Ex. 1 at 2), the officers saw a man—identified as Defendant—drive the car to another spot in the same parking lot. (Tr. 10–11.) Although this spot was near a Menard's store, Defendant did not get out of the car to enter the store. (Tr. 11.) The officers believed this conduct to be "suspicious" (Tr. 11) because the two parking spots were near each other and because Defendant did not get out of the car and enter the store. (Tr. 10–11.)

A second vehicle—a gray SUV—parked about two spaces away from Defendant's car and one occupant got out and approached the passenger side window of the Dodge Avenger. (Tr. 11.) The officers believed that a short conversation took place. (Tr. 11–12.) The second man went back to the SUV and sat inside for less than thirty seconds before returning to the Dodge Avenger (Tr. 12). This time, he got into Defendant's car and sat there for less than thirty seconds before returning to the SUV but—because of their position relative to the parked cars—the officers did not see whether a transaction took place between the two men. (Tr. 12.) However, Det. Clark testified that, in his training and experience, short interactions between people going back and forth between different cars in a parking lot while not entering the nearby store are indicative of a possible drug sale. (Tr. 12–13.) The Government also noted that "[t]his

3

conduct was consistent with information provided by the informant". (Gov't. Mem. 3; Tr. 13.)

Both vehicles drove out of the parking lot—the Dodge followed the SUV on Interstate 694 until the two drivers took different exits. (Tr. 13–14.)  Four police officers followed Defendant in separate, unmarked police cars. (Tr. 17.) Defendant made two turns without using a turn signal and the pursuing officers decided to stop the vehicle.  (Tr. 16–17.)  The four police car drivers turned on emergency lights while stopping Defendant to identify the unmarked cars as police vehicles.  (Tr. 17.)  After Defendant stopped his car (Tr. 17, 50), Det. Clark approached the driver's side of the vehicle with a second officer, Det. Koss (Tr. 17.)  The other two officers waited about fifteen to twenty feet from Defendant's vehicle (Tr. 19.)  When Det. Clark and Det. Koss approached Defendant, Det. Koss wore a vest and jacket labeled with the word "POLICE". (Tr. 51.)  Det. Clark, as a plain clothes officer, wore casual clothing but displayed a police badge hanging from his neck. (Tr. 50.)  None of the officers had their weapons drawn. (Tr. 19.)

Det. Koss asked Defendant to get out of the car (Tr. 20), identified him by reference to his driver's license (Tr. 17), and performed a "frisk" search for weapons.  (Tr. 18.)  The officers did not use force to remove Defendant from the car and found no weapons on his body.  (Tr. 20.)[2]   Det. Koss did find what he

---

[2]      Det. Clark testified that he "believe[d] that [Defendant] did say that he did have a knife or a boxcutter . . . or a small pocket knife" (Tr. 20) and the

4

believed to be a large quantity of cash in one of the Defendant's pockets, but did not remove it from Defendant at that time. (Tr. 20, 55.)   Det. Clark used the computer in his police vehicle to verify the validity of Defendant's driver's license and he did not find any warrants for Defendant (Tr. 21, 54.)

Det. Clark then returned to Defendant's car and gave Defendant the driver's license.   (Tr. 21-22.)  Det. Clark told Defendant that he was "a drug detective" (Tr. 56) and that he had received information suggesting that Defendant's activities were related to drug distribution.  (Tr. 22, 56.)  After returning the driver's license, Det. Clark told Defendant that he was "free to go" (Tr. 22, 58, 59) and did not have to talk to the officers any further or answer any more questions.  (Tr. 22, 57–59, 65.)  Defendant's keys were still in the ignition, the vehicle was running, the vehicle was not blocked, and the other officers were standing at a distance. (Tr. 24, 54, 59, 66.)  Det. Clark asked Defendant about the possible drug transaction in the Menard's parking lot. (Tr. 22.)  Defendant said that he had seen a friend in the parking lot, had a conversation with the friend, and was then driving to North Minneapolis after having an argument with his girlfriend at LivInn Suites. (Tr. 22.)

Det. Clark asked for and received Defendant's consent to search the car. (Tr. 24.)  At this point, less than two minutes had passed since the officers stopped Defendant's vehicle. (Tr. 70.)  Defendant did not, at any point, withdraw

---

Government  states that the police may have found "a small pocket knife" (Gov't. Mem. 5.)

this consent (Tr. 33) or limit it to specific areas of the vehicle. (Tr. 32–33.) At first, Defendant said that he did not have any illegal substances in the car but then admitted that there was a marijuana "roach" inside and that he had smoked it earlier in the day. (Tr. 23–24, 26.) Defendant did not say how recently he had smoked marijuana but Det. Clark testified that Defendant did not seem to be under the influence of marijuana or other narcotics when he gave consent to search the vehicle. (Tr. 26.) Defendant also said that he had a small bag of marijuana on his person—but the officers never found any bag. (Tr. 29–30.)

After Defendant consented to a search of the car and admitted that a marijuana "roach" was inside, the officers began searching the car (Tr. 24, 28.), where they quickly found the "roach" in an ashtray in the center console (Tr. 24, 66.) Defendant's car smelled of marijuana. (Tr. 28–29.)

The officers continued to search the car and found—in the trunk—a duffle bag containing around 100 grams of heroin, mail addressed to Defendant, Defendant's Social Security card, other heroin-related evidence, and other property belonging to Defendant. (Tr. 33–35, 60–62, 64–65.) It is unclear whether the duffle bag was open or zipped closed when the officers found it but it was not locked. (Tr. 60–62, 64–65.)

After Defendant said that he had a small bag of marijuana on his person and "based on probable cause," Det. Clark asked him to empty his pockets of all property. (Tr. 31.) Defendant's pockets contained "a large wad" of cash and a red permanent marker. (Tr. 30.) Based on his experience, Det. Clark suspected

6

that the marker contained narcotics in a small hiding space. (Tr. 30.) Before he was able to successfully open the end of the marker by removing the cap, Det. Clark asked Defendant if it contained drugs. (Tr. 33.) Defendant said that it did. (Tr. 33.)

The officers decided to arrest the Defendant at this point and subdued him after "a brief struggle" (Gov't. Mem. at 6, n.9.) The officers got a search warrant for Defendant's hotel room at the LivInn Suites where they found more evidence, including bullets, over $600 in cash, and a plate coated with heroin residue. (Gov't. Ex. 1, p. 3-1.)

In his motions, Defendant argues that the police stop and the subsequent warrantless search of his vehicle violated his constitutional rights. Specifically, he argues that even assuming the initial traffic stop was proper, the police unlawfully exceeded the scope of the initial encounter by continuing the detention, questioning Defendant without *Miranda* warnings, and searching Defendant's vehicle without his free and voluntary consent. The Government opposes these positions. This Court concludes that Defendant's motions to suppress evidence and statements should be denied. No matter how one looks at it—and here, there are multiple alternative bases that support the same final result—the police encounter with Defendant, including the initial stop, the questioning, and the search of his vehicle were proper, and no evidence or statements should be suppressed.

## DISCUSSION

**I.    Defendant's Motions to Suppress Tangible Evidence and Statements Obtained Due to Fourth Amendment Violations.**

This Court concludes that the police stop and the subsequent search and seizure of evidence were constitutional for two alternative reasons:  (1) either the police had reasonable articulable suspicion to believe that Defendant was engaged in criminal activity and thus were justified in briefly detaining Defendant, searching his person and the passenger compartment of his vehicle for weapons, and—upon inevitably discovering Defendant's marijuana roach in the ashtray of the center console of the vehicle—searching the entire vehicle based on probable cause of drug paraphernalia; or (2) the police conducted a lawful traffic stop and Defendant subsequently voluntarily consented to the search of his vehicle.   Either way, this Court finds no constitutional infirmities with the police stop and the search of Defendant's vehicle.

### Defendant's *Terry* Stop

"[A] police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest."  *Terry v. Ohio,* 392 U.S. 1, 30 (1968); *see also United States v. Bell,* 480 F.3d 860, 863 (8th Cir. 2007).  The officer must have "a particularized and objective basis" for suspecting criminal activity.  *Bell*, 480 F.3d at 863 (quoting *United States v. Jacobsen,* 391 F.3d 904, 906 (8th Cir. 2004)).  Such suspicion may not be based

on an inchoate or unparticularized suspicion or hunch, but must be grounded on facts which, in light of the officer's experience, support specific, reasonable inferences that justify the intrusion. *Terry,* 392 U.S. at 22. "Whether the particular facts known to the officer amount to an objective and particularized basis for a reasonable suspicion of criminal activity is determined in light of the totality of the circumstances." *Bell*, 480 F.3d at 863 (quoting *United States v. Maltais,* 403 F.3d 550, 554 (8th Cir. 2005)). When a reasonable and articulable suspicion exists, the detaining officer may conduct an investigative stop of the suspect in order to confirm or dispel his or her suspicions. *United States v. Johnson*, 64 F.3d 1120, 1124 (8th Cir. 1995).

Officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Ortiz-Monroy*, 332 F.3d 525, 529 (8th Cir. 2003) (quotations omitted). Therefore, a stop may be justified even where no traffic violation has occurred. *United States v. Mora-Higuera*, 269 F.3d 905, 909 (8th Cir. 2001). And even innocent actions may give rise to reasonable suspicion if they warrant consideration under the totality of the circumstances. *See United States v. Condelee*, 915 F.2d 1206, 1209 (8th Cir. 1990) (stating that "there could be 'circumstances in which wholly lawful conduct might justify the suspicion that criminal activity was afoot'") (quoting *Reid v. Georgia*, 448 U.S. 438, 441 (1980)).

Here, the informant provided the police with specific information regarding Defendant and his drug trafficking activities.  For example, the informant stated that Defendant was staying in Room 255 at the LivInn Suites in Fridley with his girlfriend, Convona Sims, was conducting drug deals from his room, and used rental cars to transport large amounts of heroin from Chicago, was in possession of over 100 grams of heroin, and was currently renting a gray or silver 4-door Dodge Avenger automobile (Tr. 6-9, 36-37, 44).  Further, the police already knew that the LivInn Suites is a location where numerous people had been arrested for selling or possessing controlled substances.  (Govt.'s Ex. 1 at 2.)  And the police did not merely rely on the information supplied by the informant.  Instead, they confirmed that Defendant had, in fact, been staying with Ms. Sims in Room 255 at the LivInn Suites since late October 2010 and was renting a gray or silver 4-door Dodge Avenger.  (Tr. 9, 42, 44.)  The police then saw Defendant drive the Dodge Avenger a very short distance from the motel and meet with another man under circumstances that the police reasonably believed constituted a drug transaction.  (Tr. 10-12, 44-45.)  These facts corroborated the information provided by the informant.  Under these circumstances, the police had a reasonable, articulable suspicion to believe that Defendant was committing or had committed a drug offense and that his vehicle contained evidence of the offense.  As such, the police were justified in stopping Defendant, asking him to step outside of his car, and searching him and the passenger compartment of his vehicle for weapons.  During the search, the police would have inevitably

discovered the marijuana roach in the ashtray of the center console of the car, which would in turn provide them with probable cause to search the entire vehicle. *See U.S. v. Rowland*, 341 F.3d 774, 785 (8th Cir. 2003) (discovery of drug paraphernalia during the *Terry* search was "sufficient to create probable cause to search the entire vehicle").

### The Traffic Stop and the Post-Traffic Stop Encounter

Even assuming the police did not have reasonable suspicion to believe that Defendant was engaged in criminal activity, the police stop and the vehicle search were nonetheless proper because Defendant voluntarily consented to the search after a valid traffic stop.

"[A]ny traffic violation, even a minor one, gives an officer probable cause to stop the violator. [In such a case,] the stop is objectively reasonable and any ulterior motivation on the officer's part is irrelevant." *Johnson v. Crooks*, 326 F.3d 995, 998 (8th Cir. 2003) (alteration in original) (quotations omitted); *United States v. Walker*, 555 F.3d 716, 720 (8th Cir. 2009) ("[A]ny traffic violation provides probable cause for a traffic stop."). The constitutional reasonableness of a traffic stop does not depend on the actual motivations of the officer involved as the subjective intentions of the officer making the stop are irrelevant in determining the validity of the stop. *Whren v. United States,* 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). For example, an officer's subjective motivations do not affect the reasonableness of a traffic stop based on the violation of the traffic laws. *Long,* 532 F.3d at 795; *United States v. Chatman,*

11

119 F.3d 1335, 1340 (8th Cir.1997) ("[T]he stop is valid even if the police would have ignored the traffic violation but for their suspicion that greater crimes are afoot.") (internal quotation omitted).

Here, Det. Clark observed a traffic violation when Defendant failed to use his turn signal as he exited Interstate 94 onto Dowling Avenue and also failed to use his turn signal when turning right onto Dowling Avenue.  (Tr. 14-15.)  This Court credits Det. Clark's testimony and conduct on the evening of December 8, 2010.  The traffic stop was legal and did not taint the subsequent search.

During the initial traffic stop, Det. Clark efficiently carried out all the standard stop procedures, including asking Defendant to step out of the vehicle, checking his driver's license, determining whether the driver's license was valid and whether Defendant had any warrants.  After completing those tasks, Detective Clark returned to Defendant and handed back Defendant's driver's license.  Det. Clark testified that he told Defendant that he was a drug Det. and that he received information that Defendant was distributing drugs.  Det. Clark also told Defendant that he was free to go and that he did not have to talk with him any longer.  At that point, Defendant's car was still running, with the keys in the ignition.  Further, Defendant's vehicle was not blocked.  Under the circumstances of this case, those actions ended the initial traffic stop.  The events beyond that point, however, did not constitute a seizure, as Defendant contends. Instead, after Defendant's license was returned, "the encounter became nothing more than a consensual encounter between a private citizen

12

and a law enforcement officer." *United States v. White,* 81 F.3d 775, 778 (8th Cir. 1996)

Even without reasonable suspicion, an officer may ask questions unrelated to the traffic stop during a post-stop consensual encounter. *United States v. Esquivel,* 507 F.3d 1154, 1159 (8th Cir. 2007). After informing Defendant that he was free to leave and did not have to speak with him, Defendant Clark asked Defendant about the suspected drug transaction in the Menard's parking lot. Defendant stated that he was heading for North Minneapolis, had a conversation with a person in the parking lot, and had left the LivInn Suites after having an argument with his girlfriend. (Tr. 22.) Det. Clark then asked Defendant whether he could search Defendant's vehicle, and Defendant responded "yes". This Court concludes that at the time Det. Clark asked Defendant additional questions, including questions about carrying contraband, and requested permission to search, Defendant had been informed that he was free to leave, and the post-stop questions posed by Det. Clark, including his request to search Defendant's vehicle, took place during a consensual encounter with Defendant.

Defendant argues that he was unlawfully detained when Det. Clark started asking about drugs, requested to search the vehicle, and searched it. This Court disagrees. Before he asked permission to search, Det. Clark had already returned the license to Defendant. *See White,* 81 F.3d at 779 (where officer returned suspect's license and registration and issued a warning ticket following a traffic stop suspect "had everything he needed to lawfully proceed on his

journey," and the officer's subsequent request to search "came during the course of a consensual encounter and was permissible with or without reasonable suspicion.").   As explained above, once Det. Clark returned the documents, Defendant had everything he needed to continue his trip.  Thus, his ongoing conversation with the police was consensual.   And Det. Clark's request to search came during this consensual encounter.  In sum, as explained below, totality of the circumstances makes clear that Defendant gave knowing and intelligent consent to allow the police to search his car because, among other things, the encounter was brief, occurred on a public interstate, Defendant provided coherent and responsive answers to Det. Clark, no threats or deception were used on Defendant, and Defendant never objected to the search.

### Defendant's Consent to the Car Search

Police may conduct a search of someone's vehicle  without a warrant or probable cause if that person voluntarily consents to the search. *See, e.g., United States v. Bradley,* 234 F.3d 363, 366 (8th Cir. 2000); *United States v. Deanda,* 73 F .3d 825 (8th Cir.1996). To determine whether such consent was voluntary, the court must examine the totality of the circumstances, including the characteristics of the accused and the nature of the encounter.  *See Bradley,* 234 F.3d at 366.  The government has the burden of proving consent was voluntary. *United States v. Parris,* 17 F.3d 227, 229 (8th Cir.), *cert. denied,* 511 U.S. 1077 (1994); *United States v. Heath,* 58 F.3d 1271, 1275 (8th Cir.), *cert. denied,* 516 U.S. 892 (1995). "The prosecution need not prove that the individual was fully

aware of his or her rights under the Fourth Amendment in order to establish a voluntary consent." *Heath,* 58 F.3d at 1275 (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 235 (1973)). "Consent is voluntary 'if it was the product of an essentially free and unconstrained choice by its maker, rather than the product of duress or coercion, express or implied.'" *United States v. Fleck,* 413 F.3d 883, 891 (8th Cir.2005) (quoting *United States v. Chaidez,* 906 F.2d 377, 380 (8th Cir.1990)).

The failure to inform an individual of his or her right to refuse consent, in itself, will not render a consent involuntary. Indeed, courts have rejected in specific terms the suggestion that police officers must always inform citizens of their right to refuse when seeking permission to conduct a warrantless consent search. *See, e.g., Ohio v. Robinette,* 519 U.S. 33, 39-40 (1996); *Schneckloth,* 412 U.S. at 227. Thus, no presumption of invalidity attaches if a citizen consented without explicit notification that he or she was free to refuse to cooperate. Instead, numerous courts have repeated that the totality of the circumstances must control, without giving extra weight to the absence of this type of warning. *See, e.g., Schneckloth,* 412 U.S. at 227*; United States v. Drayton,* 536 U.S. 194, 206-207 (2002); *accord United States v. Brown,* 345 F.3d 574, 579 (8th Cir. 2003); *United States v. Santos-Garcia,* 313 F.3d at 1078.

Here, based on the evidence in the record, as well as Det. Clark's testimony, this Court finds that Defendant verbally consented to the search of his vehicle. And Defendant's consent was not limited in any fashion, not retracted,

15

and not the result of any threat, promise, or inducement by the police. Defendant did not ask any questions, and did not ask the police to stop the search.

Courts in this Circuit generally consider the "*Chaidez* factors" to determine whether consent was voluntary: "Characteristics of persons giving consent" which may be relevant to the question include: (1) their age; (2) their general intelligence and education; (3) whether they were intoxicated or under the influence of drugs when consenting; (4) whether they consented after being informed of their right to withhold consent or of their *Miranda* rights; and (5) whether, because they had been previously arrested, they were aware of the protections afforded to suspected criminals by the legal system. *Chaidez*, 906 F.2d at 381 (internal citations omitted). Further, characteristics of "the environment in which consent was given" include whether the person who consented: (1) was detained and questioned for a long or short time; (2) was threatened, physically intimidated, or punished by the police; (3) relied upon promises or misrepresentations made by the police; (4) was in custody or under arrest when the consent was given; (5) was in a public or a secluded place; or (6) either objected to the search or stood by silently while the search occurred. *Id.* (internal citations omitted). These factors should not be applied mechanically, *id.,* and no single factor is dispositive or controlling. Instead, courts look at the totality of circumstances to determine whether a person voluntarily consented. *Id.*

Here, as a 51-years-old man, Defendant was old enough to appreciate the nature and significance of his actions.  As for intelligence and education, neither the Government nor Defendant presented any evidence concerning Defendant's general intelligence or education.  But based on his responses to the police, Defendant appears to be of normal intelligence.  And while Defendant stated that he smoked a marijuana "roach" earlier in the day, there is no evidence that he used marijuana shortly before giving consent.   Importantly, Defendant did not appear to be intoxicated, and his speech was not influenced by drugs or alcohol. (Tr. 26-27.)  Defendant was articulate; he communicated well; his words were not slurred; his balance was steady; and his pupils were dilated.  (Tr. 67.)  Defendant did not appear to be confused or initially nervous, agitated or excited (Tr. 28).  In sum, there is no evidence that Defendant was intoxicated or under the influence of drugs at the time of his consent.

Furthermore, as explained below, this Court finds that Defendant was not in custody at the time he gave consent.  As such, no *Miranda* warnings were warranted.   Regardless, as discussed above, prior to asking Defendant's consent, Det.  Clark handed Defendant his driver's license and informed him that he was free to go and that he did not have to answer questions (Tr. 21-22, 54, 57-59, 65).  As such, that Defendant was not read *Miranda* rights has little bearing on the voluntariness of his consent.

Also in favor of the Government is the fact that Defendant has a long arrest record and was undoubtedly advised of his rights and protections on

numerous prior occasions. (Tr. 27.) As far as the length of detention, only two

minutes passed from the time of the initial stop of the defendant and his consent

to search his vehicle. (Tr. 64, 69-70.) And although there were four officers

present at the scene of the stop, the record suggests that two of the officers were

little more than passive observers prior to commencement of the search.

Notably, Det. Clark acted to minimize any undo pressure on Defendant by talking

to him without the other officers in close proximity (Tr. 59). Thus, this factor too

weighs in favor of the Government. Further, there is no evidence that the police

made any promises or misrepresentations to obtain Defendant's consent.

Instead, Det. Clark disclosed the reasons for stopping Defendant and the nature

of his investigation. As explained above, Defendant was not in custody when he

consented and had been told that he was free to go. (Tr. 22, 57-59, 65.)

Defendant's car was not blocked.

Moreover, Defendant's entire police encounter, including his consent to

search the car occurred on a public highway. Finally, Defendant never attempted

to withdraw his consent or complained to the police about the scope of the

search as it was being conducted. In sum, this Court finds that Defendant

voluntarily consented to the search of his vehicle.

## II.    Defendant's Motion to Suppress Statements.

Defendant's motion to suppress statements is premised on the contention

that because he was in custody during the police stop and was not given the

*Miranda* warning, his statements should be suppressed. The Government

disagrees, arguing that no *Miranda* warning was required because the totality of the circumstances shows that Defendant was not in custody.[3]  This Court agrees.

A *Miranda* warning is required only when a suspect is subjected to custodial interrogation.  *See Miranda v. Arizona,* 384 U.S. 436, 467-68 (1966). *Thompson v. Keohane,* 516 U.S. 99, 112 (1995), sets forth a two-part test for determining whether an interrogation is custodial.  The court must examine: "(1) the circumstances surrounding the interrogation; and (2) given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Id.* at 112.  The "determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California,* 511 U.S. 318, 323 (1994).

When determining whether a suspect is in custody, courts consider the following six "indicia of custody", which "tend to either mitigate or aggravate an atmosphere of custodial interrogation":  (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so;  (2) whether the suspect had unrestrained freedom of movement during the encounter; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions;  (4) whether strong arm tactics or deceptive

---

[3]  The Government also represents that it has no intention of introducing these statements in its case in chief.

stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning. *United States v. Griffin,* 922 F.2d 1343, 1349 (8th Cir. 1990). Further, as recently noted by the Eighth Circuit:

> [the] advice of freedom to terminate the encounter should not be treated merely as one equal factor in a multi-factor balancing test designed to discern whether a reasonable person would have understood himself to be in custody. That a person is told repeatedly that he is free to terminate an interview is powerful evidence that a reasonable person would have understood that he was free to terminate the interview. So powerful, indeed, that **no governing precedent of the Supreme Court or this court, or any case from another court of appeals** that can be located (save one decision of the Ninth Circuit decided under an outmoded standard of review, *United States v. Lee,* 699 F.2d 466, 467-68 (9th Cir.1982) (per curiam)), **holds that a person was in custody after being clearly advised of his freedom to leave or terminate questioning**.

*U.S. v. Czichray*, 378 F.3d 822, 826 (8th Cir. 2004) (emphasis added); *see also United States v. Elzahabi,* 557 F.3d 879, 884 (8th Cir. 2009) ("An explicit assertion that the defendant may end the encounter generally removes any custodial trappings from the questioning.") (quotation omitted), *cert. denied*, 129 S.Ct. 2781 (2009).

Here, Defendant was explicitly told that he was free to leave and did not have to answer questions. The Defendant's car was not blocked, his keys were still in the ignition, the car was running, and Defendant was standing near the open door to his vehicle. The hefty inference that Defendant was not in custody after receiving such advice is only strengthened by the context in which the encounter took place. The police encounter was on a public highway. And

there is no evidence or suggestion that the police used strong tactics or misled Defendant.  As discussed above, Det. Clark took the lead on talking with Defendant to reduce any undue pressure on him, and was forthright with Defendant about the nature of the investigation and the reason for stopping him. No weapons were drawn during the police encounter.  In sum, this Court concludes that based on the totality of the circumstances, Defendant was not in custody when he made the statements.  Accordingly, this Court denies Defendant's motion to suppress statements obtained during the police stop.

III.    **The Search Warrant**

Defendant argues that should the motions to suppress evidence be granted, the remaining information is insufficient to support probable cause for the issuance of the search warrant for Defendant's motel room.  Because this Court denies Defendant's motions to suppress evidence and statements, Defendant has no basis to challenge the constitutionality of the search warrant. Nonetheless, this Court has reviewed the search warrant and concludes that there was sufficient probable cause to support the issuance of the warrant.

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that:

1.      Defendant's Motion to Suppress Statements (Doc. No. 12), be **DENIED**;

2.      Defendant's Motion to Suppress Tangible Evidence & Statements Due to Fourth Amendment Violations (Doc. No. 13), be **DENIED**; and

3.      Defendant's Supplemental Motion to Suppress Tangible Evidence &
Statements Due to Fourth Amendment Violations (Doc. No. 18), be **DENIED**.


Date:  February 10, 2011

s/Jeffrey J. Keyes

JEFFREY J. KEYES
United States Magistrate Judge


Under D. Minn. LR 72.2(b), any party may object to this Report and
Recommendation by filing with the Clerk of Court, and serving all parties by
**February 18, 2011**, a writing which specifically identifies those portions of this
Report to which objections are made and the basis of those objections.  Failure
to comply with this procedure may operate as a forfeiture of the objecting party's
right to seek review in the Court of Appeals.  A party may respond to the
objecting party's brief within **seven days** after service thereof.[4]  All briefs filed
under this rule shall be limited to 3500 words.  A judge shall make a de novo
determination of those portions of the Report to which objection is made.  This
Report and Recommendation does not constitute an order or judgment of the
District Court, and it is therefore not appealable directly to the Circuit Court of
Appeals.

---

[4]      This Court previously informed the parties that a shortened objections
period will be imposed in this case.